Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. At the time of the alleged injury by accident, the employer-employee relationship existed between the defendant-employer and the plaintiff.
3. The defendant-employer is a duly-qualified self-insurer with Aegis Administrative Services, Inc. acting as their servicing agent.
4. Plaintiff's average weekly wage was $410.83, based upon an Industrial Commission Form 22.
5. The following Stipulated Exhibits were submitted into evidence: Stipulated Exhibit #1 — Medical Records; Stipulated Exhibit #2 — Employment records for plaintiff's current employer (not defendant-employer); and Stipulated Exhibit #3 — Plaintiff's recorded statement taken July 31, 1995.
 ***********
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact by the Deputy Commissioner with minor modifications as follows:
 FINDINGS OF FACT
1. At the time of plaintiff's injury on June 23, 1995, plaintiff worked as a long haul trucker for Kontane, Inc. Plaintiff's employment required him to drive trucking routes to and from Hickory, North Carolina to locations as far away as Texas.
2. On June 23, 1995, plaintiff alleges that at approximately 6:00 p.m., as he was traveling in the passing lane of Southbound I-75, a trucker, pulling a white trailer with yellow and black letters designating "Roberts" as the carrier, pulled from the right lane to the left lane, cutting plaintiff off. Plaintiff alleges that when the trucker cut him off, he calmly stated over his CB radio "good turn signal, truck driver."
3. Plaintiff then alleges that he proceeded to the next rest area on I-75 near Bowling Green, and stopped his truck in order to use the restroom. Plaintiff alleges that as he stepped outside of his truck cab, he was accosted by the driver from the "Roberts" vehicle (a man he described as a "black man with oily hair"), and that the driver stabbed him multiple times, almost killing him. Plaintiff denies that he ever made any other comments to the "Roberts" driver, either over the CB radio or in person, which could have prompted an assault that nearly brought about his own death.
4. The video deposition of the "Roberts" truck driver, Mr. Joseph Ragland, was taken subsequent to the hearing. Mr. Ragland testified that he was driving through Ohio, near Bowling Green in the left hand of Southbound I-75 when plaintiff, in the Kontane vehicle, came over the CB radio and asked him to get out of his way because he had "places to go and things to do." Mr. Ragland testified that he then moved his truck into the right lane and that, while plaintiff was beginning to pass his vehicle in the left lane, plaintiff made derogatory comments over the CB radio about Canadians taking jobs from "hard-working Americans." The truck Mr. Ragland was driving had a Canadian license plate.
5. Mr. Ragland testified that when plaintiff passed his truck and made eye contact with him, plaintiff stated, "Oh, it's a Canadian nigger. That's even worse." Mr. Ragland responded by saying, "I'm not a Canadian. I'll let you know that I'm an American nigger." Mr. Ragland testified that plaintiff said, "Like I said, that's even worse."
6. According to Mr. Ragland, the conversation continued as follows: Mr. Ragland told plaintiff that that didn't have anything to do with him and that if plaintiff had any fault with that to "blame it on your ancestors, because they brought us over here." Plaintiff then allegedly responded with "Don't be talking about my ancestors, because you black asses have taken up all the welfare and all the jobs that decent white men supposed to have over here." Mr. Ragland then reminded plaintiff to tell it to his ancestors because he didn't care to hear it.
7. Mr. Ragland stated that plaintiff concluded his message with the threat: "If you pull your truck over, I'll kick your black ass." Mr. Ragland testified that he told plaintiff over the CB radio that he stopped every day at the upcoming rest area and that is where he would be. Mr. Ragland testified that his feelings were hurt by plaintiff's racial remarks since the remarks were directed to his person and that the conversation did not involve matters dealing with driving or employment as truck drivers.
8. Mr. Ragland testified that a few miles down the road, he pulled his truck into the rest area and parked, where he remained sitting in his cab completing some paperwork when the left-hand door of his cab was pulled open by plaintiff who stood there and said, "You're a stupid nigger, aren't you?" Plaintiff testified that he recognized the man by "voice" as the driver of the Kontane flatbed truck which had previously been behind him on Southbound I-75. Mr. Ragland testified that he then tried to close his left door, at which time plaintiff "stiff-armed" the door to keep it open and that plaintiff sprayed him with mace on the left side of his body. Mr. Ragland testified that, as he, himself reached to his left to get a crowbar with which he could knock plaintiff's hands off the door, he slipped, thereby allowing plaintiff to spray him in the face with mace. Mr. Ragland testified that after he was sprayed in the face with mace, he then fell out of the cab onto the ground. Mr. Ragland testified that while he was laying on the ground, plaintiff began kicking him and said, "Nigger, this is where you're going to die." Mr. Ragland testified that a knife fight ensued and that during the fight he stabbed plaintiff.
9. Subsequent to trial, the video deposition of Arkansas truck driver, Billy Joe Moore, was taken. Mr. Moore testified that on June 23, 1995, he was sitting in his truck in the same rest area off of I-75 near Bowling Green, Ohio. Mr. Moore testified that he just happened to be sitting there completing his log book while listening to his CB radio. Mr. Moore stated that sometime during late afternoon, he heard two drivers talking to each other over the CB radio. Mr. Moore testified that he heard one driver tell the other "to pull his black ass into the rest area and he would straighten it out for him." Mr. Moore testified that subsequent to hearing that comment, he exited his truck in order to use the restroom and make a telephone call. Mr. Moore testified that upon returning to his truck about ten minutes later he saw an ambulance come into the rest area. Mr. Moore stated that after noticing the ambulance and speaking to onlookers, he realized that someone had been stabbed because of the derogatory conversation he had heard over the CB radio. Mr. Moore then spoke with the Ohio State Police and gave them a statement about what he had heard. Mr. Moore testified that other than hearing the one racial slur, he heard no further conversations over the CB radio concerning the driving habits of the individuals who were involved in the fight. Mr. Ragland subsequently pled guilty to a lesser charge of aggravated assault in the criminal courts of Ohio. Mr. Ragland did not have a warrant issued against plaintiff.
10. As a result of the knifing incident, plaintiff suffered injuries to his left brachial plexus, his left wrist and his left knee. Plaintiff was transported by helicopter to St. Mary's Hospital in Toledo, where he was treated and released. Upon returning to Hickory, North Carolina, plaintiff began treating with neurosurgeon, Dr. William Sims. Dr. Sims treated plaintiff until approximately April of 1996, at which time he terminated his care due to plaintiff's noncompliance with his treatment. Dr. Sims testified that he did not initially believe that plaintiff could work as a truck driver in December of 1995, but that he has no objection, from a medical standpoint, for plaintiff to work as a truck driver to the extent that plaintiff could tolerate it.
11. From June 1996 to early December of 1996, plaintiff worked between 100 and 120 hours per week hauling mobile homes throughout North Carolina for Specialized Transport of Vail, North Carolina. In the summer of 1996, plaintiff also delivered phone books for four weeks and was paid $500.00. Plaintiff worked for a period of three weeks for Deadline Freight of Hudson, North Carolina. He drove one trip to California for this company and was laid off since the owner was going out of business. Plaintiff recalled being paid $2,500.00.
12. In February of 1997, plaintiff began working for TGH Enterprises as a truck driver delivering furniture from Hickory to locations throughout eastern North Carolina. Plaintiff works approximately thirty-six (36) hours per week for this employer and is paid $100.00 per trip plus $7.00 per hour if he must stop at any furniture locations and pick up merchandise on his return trips. Part of his job duties include delivering and assisting with some of the unloading of the furniture, which requires lifting anywhere from thirty to ninety pounds.
13. For purposes of impeaching plaintiff's testimony at the hearing, it was entered into evidence that plaintiff was denied financial assistance for his medical bills resulting from this incident because the Victim Assistance Program in Ohio found that plaintiff had provoked the altercation.
14. Upon observing the demeanor of the plaintiff at the hearing, and the demeanors of Mr. Ragland and Mr. Moore by way of video deposition; and after assessing the credibility of these witnesses and considering the other evidence in the record, the Deputy Commissioner gave greater weight to the testimony of Mr. Ragland and Mr. Moore with respect to the events that transpired on June 23, 1995. Therefore, the Full Commission finds as fact that plaintiff's testimony concerning the assault is not credible.
15. At the time of the altercation between plaintiff and Mr. Ragland on June 23, 1995, plaintiff was not operating in the course and scope of his employment, and his resulting injuries and disability did not arise out of his employment. Instead, plaintiff sought to settle a personal racial vendetta, which was in no way related to his employment with the defendant-employer.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On June 23, 1995, plaintiff did not suffer an injury by accident arising out of and in the course of his employment with the defendant-employer. G.S. § 97-2(6).
2. At the time of the altercation between plaintiff and his assailant on June 23, 1995, plaintiff was not operating in the course and scope of his employment, and his resulting injuries and disability did not arise out of his employment. Instead, there was a distinct and total departure from his employment in order for plaintiff to settle a personal vendetta. G.S. §97-2(6).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim is, and under the law must be DENIED.
2. Each side shall pay its own costs.
This the ___ day of February 1999.
 S/_________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/______________________ BERNADINE S. BALLANCE COMMISSIONER
S/______________________ THOMAS J. BOLCH COMMISSIONER